UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| SHAWNOTHY DWIGHT NEWTON, | CASE NO. 5:22-CV-01949-JRA |
| Plaintiff, | JUDGE JOHN R. ADAMS |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## INTRODUCTION

Plaintiff Shawnothy Dwight Newton challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On October 31, 2022, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated Oct. 31, 2022). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** the case for additional proceedings consistent with this recommendation.

## PROCEDURAL BACKGROUND

Mr. Newton filed for DIB and SSI on December 28, 2020, alleging a disability onset date of August 30, 2020. (Tr. 72-73). The claims were denied initially and on reconsideration. (Tr. 74-107). Mr. Newton then requested a hearing before an Administrative Law Judge. (Tr. 137-38). Mr.

1

Newton (represented by counsel) and a vocational expert (VE) testified before the ALJ on September 27, 2021. (Tr. 29-66). On October 5, 2021, the ALJ issued a written decision finding Mr. Newton not disabled. (Tr. 12-28). The Appeals Council denied Mr. Newton's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Mr. Newton timely filed this action on October 29, 2022. (ECF #1).

FACTUAL BACKGROUND

I.     PERSONAL AND VOCATIONAL EVIDENCE

Mr. Newton was 38 years old on the alleged onset date, and 40 years old at the administrative hearing. (Tr. 74). Mr. Newton graduated from high school under an Individualized Education Plan (IEP) (Tr. 326) where he received specific learning disability services due to the following:

> Poor reading skills make it difficult for Shawn to do well on any task that requires independent reading. Deficits in listening comprehension make it difficult for Shawn to learn in a setting where a primarily oral approach to teaching is used. Poor math skills would make it difficult for Shawn to be successful with Regular Education Math curriculum expectancies. Poor attendance at school makes it difficult for Shawn to keep up with schoolwork.

(Tr. 38, 322).

Mr. Newton has worked as a security guard, auto detailer, cleaner, lot attendant, and on assembly lines. (Tr. 39-47).

II.    RELEVANT MEDICAL EVIDENCE

On December 17, 2019, Mr. Newton presented at the emergency department with his mom for "worsening anxiety" after he started a new job that morning. (Tr. 380-81). He described a history of anxiety, depression, and bipolar disorder and explained not taking his mental health

2

medications (Lamictal, bupropion, citalopram) for three weeks because he could not afford them. (*Id.*). He expressed increased frustration about living with his sister and difficulty with controlling his thoughts. (Tr. 381). Mr. Newton was visibly anxious, rocked in bed, and made poor eye contact but was alert and interactive. (*Id.*). The emergency department provider felt Mr. Newton was suffering from acute anxiety, perhaps hypomania. (Tr. 382). He received Ativan and appeared more stable on re-examination. (Tr. 382). Mr. Newton was discharged in fair condition with his prescriptions. (Tr. 382-83).

The following day, Mr. Newton returned to Coleman Professional Services for a psychiatric visit. (Tr. 492-97). Michelle Garrett, a board-certified nurse practitioner, noted this to be Mr. Newton's first appointment since the summer. (Tr. 492). Mental status examination revealed normal eye contact, speech, and language; a depressed, tearful mood; concrete thought process with preoccupation;[1] and some issues with attention, concentration, and memory. (Tr. 493-95). Nurse Garrett diagnosed unspecified bipolar disorder and schizoid personality disorder and restarted Mr. Newton's medications on a titration schedule. (Tr. 495-96).

On January 30, 2020, Mr. Newton returned to Nurse Garrett and endorsed some depression, anxiety, and anger but felt much more stable being back on medication. (Tr. 498, 502). He was emotional throughout the session but maintained normal eye contact and speech, had a concrete thought process with some preoccupations and visual disturbances (seeing shadows), and had some attention/concentration and memory issues. (Tr. 499-501).

---

[1]    According to the American Psychological Association, preoccupation is "a state of being self-absorbed and 'lost in thought,' which ranges from transient absent-mindedness to a symptom of a mental disorder, as when an individual with schizophrenia withdraws from external reality and turns inward upon the self." APA Dictionary of Psychology, *Preoccupation,* https://dictionary.apa.org/preoccupation (last accessed September 25, 2023).

During an April 27, 2020 telehealth appointment, Mr. Newton informed Nurse Garrett that he did not want medications right now because his stress was low and stated he would tell her if he started to feel bad again. (Tr. 504). He explained that he did not pick up his prescriptions due to the pandemic but felt well and claimed the medication just "makes [him] soft." (*Id.*). He continued to have anger, but no explosions. (*Id.*). Mr. Newton endorsed less stress after moving out of his sister's house and into a duplex across the street from his parents and continued to work. (*Id.*). He admitted to some psychosis but described it as "not bad" and claimed he experienced symptoms of psychosis even when on medication. (*Id.*). Despite Nurse Garrett's recommendation to stay on low doses of medication, Mr. Newton refused all prescriptions. (Tr. 508). Nurse Garrett noted Mr. Newton's continued perseverations[2] and odd thinking. (Tr. 506). Mental status examination otherwise revealed preoccupations and attention/concentration and memory issues. (Tr. 506-07). Nurse Garrett found Mr. Newton exhibited fair to poor judgment and insight because he stopped taking all medications and noted his long history of instable moods and magical thinking. (Tr. 507). In addition to unspecified bipolar disorder and schizoid personality disorder, Nurse Garrett diagnosed Mr. Newton with nonadherence to medical treatment. (Tr. 508). Two months later, on June 22, 2020, Mr. Newton asked Nurse Garrett to restart his medications. (Tr. 509-10).

On December 3, 2020, Mr. Newton attended a telehealth appointment with Nurse Garrett and reported feeling depressed and highly stressed with increased mood swings and anger. (Tr. 511). Mr. Newton reported losing his job in September, stopping all medications after the job loss,

---

[2]        In clinical psychology, perseveration refers to the uncontrollable repetition of a previously appropriate or correct response, even though the repeated response has since become inappropriate or incorrect. *Stedman's Medical Dictionary,* STEDMAN'S 674160 perseveration.

losing his car, and would soon lose his duplex. (*Id.*). He endorsed hearing a negative voice in his head that keeps him up at night. (*Id.*). Again, Nurse Garrett noted Mr. Newton's continued perseverations and odd thinking, with preoccupations, and some issues with attention, concentration, and memory. (Tr. 513-14). Nurse Garrett restarted Mr. Newton's medications and added Latuda for psychosis. (Tr. 517).

At his next telehealth appointment with Nurse Garrett on February 3, 2021, Mr. Newton reported that he lost his apartment and returned to his sister's residence. (Tr. 520). Nurse Garrett noted Mr. Newton's mood had begun to stabilize but still displayed ongoing magical thinking. (*Id.*). He endorsed frustration and feelings of low self-worth over his many unsuccessful attempts to work, anxiety about paying bills, and feelings of anger without explosive outbursts. (*Id.*). He also reported isolating in his room when he gets frustrated. (*Id.*). Mental status examination revealed a depressed and sad mood, perseverations, preoccupations, magical thinking, and some issues with attention, concentrate, and memory. (Tr. 522-23). Nurse Garrett ordered Mr. Newton to continue titrating his medications and increased his dose of Lamictal. (Tr. 525).

In an April 8, 2021 telehealth appointment with Nurse Garrett, Mr. Newton reported some depression and anxiety but described functioning fairly well, with fewer angry outbursts and less racing thoughts. (Tr. 540). Nurse Garrett noted Mr. Newton was engaged and sounded more hopeful during the session. (Tr. 542). Mr. Newton endorsed an improved mood. (Tr. 543). Otherwise, mental status examination revealed concrete thought process with continued perseverations, preoccupations with continued magical thinking, and some issues with attention, concentration, and memory. (*Id.*). Nurse Garrett maintained his prescriptions unchanged. (Tr. 546).

On May 12, 2021, Mr. Newton attended another telehealth appointment with Nurse Garrett and described doing a little better. (Tr. 557). He reported some depression and anxiety with ongoing worry, but no panic, and stated he felt calmer. (*Id*.). The voice in his head was still present, but had quieted. (*Id*.). He continued to struggle with sleeping. (*Id*.). Mental status examination revealed continued perseverations, preoccupations, audio hallucinations described as low voices, continued magical and odd thinking, and some issue with attention, concentration, and memory. (Tr. 560). Nurse Garrett continued Mr. Newton's medications and recommended counseling. (Tr. 563).

On July 1, 2021, Mr. Newton met with Nurse Garrett via telehealth appointment and endorsed feeling stressed because his dad and brother were being "punks" to him. (Tr. 565). He reported depression, anxiety in the form of racing thoughts that he cannot shut off, and poor sleep. (*Id*.). Mental status examination revealed irritability, perseverations, preoccupations, hallucinations, and obsessions ("more my own thought I can't stop going over and over again"), and some issue with attention, concentration, and memory. (Tr. 568-69). Mr. Newton did not want his medications changed. (Tr. 571).

On July 13, 2021, Mr. Newton attended his first counseling session with Mallory Stevens, LSW. (Tr. 549-51). Mr. Newton reported a mistrust of others, paranoia, and explosive outbursts that he manages with medication and walking away from stressful situations. (Tr. 549). He described recently losing his job, car, and duplex, reported living with his friend, and explained, "I do a job for a few months and I get bored or supervisors get in my face." (*Id*.). Mr. Newton met with Ms. Stevens again on July 27, 2021 and reported moving in with another friend. (Tr. 552). He

described his anger as "an animal [he has] to cage, it's like being possessed." (Tr. 553). He reported

his fear of crowds but relies on his sister for support in those situations. (*Id.*).

On August 10, 2021, Mr. Newton met with Ms. Stevens and reported "[t]hings have been

going decent," though he continued to endorse feeling anxiety in crowds and public situations.

(Tr. 555).

## III.    MEDICAL OPINIONS

On November 21, 2006, Mr. Newton attended a consultative examination in relation to a

prior claim for disability when he was 25 years old. (Tr. 328-32). Ryan L. Dunn, Ph.D., performed

the examination and noted Mr. Newton's girlfriend completed the initial paperwork due to Mr.

Newton's reported difficulty in reading and writing. (Tr. 328). Mr. Newton reported being easily

distracted and having difficulty getting along with others, concentrating, staying on task, and

handling stressful situations. (*Id.*; Tr. 331). At the time, Mr. Newton reported working at his

father's automotive business, though at a slower pace than other employees. (Tr. 329). During the

evaluation, Mr. Newton was somewhat anxious, with fidgeting and mild agitation, his answers to

questions were scattered, and he required frequent redirection. (Tr. 330). Though Mr. Newton was

alert and oriented, his attention and concentration "appeared to be slightly below average" and his

"[m]anner, clinical presentation, vocabulary, and apparent range of basic information suggested

cognitive functioning in the borderline range." (Tr. 330). Dr. Dunn offered the following

conclusions:

> 1.    The claimant's mental ability to relate to others, including fellow workers
>       and supervisors, showed mild-moderate limitations which likely fluctuate
>       within this range given the social intensity of the work setting, e.g.,
>       functioning better in lower-social-intensity situations, and less so as the
>       intensity and frequency of social interactions at work increases.

7

2.    The claimant's mental ability to understand, remember, and follow instructions showed no significant limitations for fairly simple instructions, although he may show mild or moderate limitations in these areas as the complexity of instructions increases.

3.    The claimant's ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks shows apparent moderate limitations, given his reported difficulties in concentrating on his current job involving repetitive tasks.

4.    The claimant's mental ability to withstand the stress and pressures associated with day-to-day work activity showed possible mild limitations, given his presentation and reported performance on his current job position.

(Tr. 331-32).

In March 2010, Mr. Newton attended another consultative in relation to a prior claim for disability. (Tr. 359-65). Michael Harvan, Ph.D., noted Mr. Newton's thoughts were initially goal-directed but frequently strayed into tangential commentary and often provided "an excessive amount of unnecessary detail." (Tr. 361). Mr. Newton was mildly anxious and expressed feeling as though his mind never stops. (*Id*.). These preoccupying thoughts occur constantly. (Tr. 362). He only feels relaxed when he is watching a movie or spending time with a friend. (*Id*.). Meeting new people and doing things he has never done before trigger Mr. Newton's feelings of anxiety. (*Id*.). He has trouble concentrating when he struggles with a task but does not struggle to watch a movie. (*Id*.) ("I'm a visual learner"). Medication helps him feel calmer. (*Id*.). He noted losing control and hurting his now ex-wife once when he was not on his medication. (*Id*.). Mr. Newton endorsed distrusting others in general and having suspicious, paranoid thoughts. (*Id*.).

Based on sensorium and cognitive function testing and the clinical interview, Dr. Harvan determined Mr. Newton is moderately limited in short-term term and remote long-term memory functioning, and mildly limited in immediate long-term memory functioning. (Tr. 364). Dr.

Harvan found moderate impairment of Mr. Newton's ability to maintain attention to perform simple and multi-step repetitive tasks, noting he "had difficulty focusing attention throughout the evaluation to questions asked. He would frequently lose focus from what was asked and ramble on about things related, one though triggering another. His pace of performance was thereby slowed." (Tr. 364-65). Dr. Harvan determined Mr. Newton's ability to relate to others, including co-workers and supervisors, was moderately impaired and his ability to withstand the stress and pressures associated with day-to-day work activity mildly impaired. (Tr. 365).

On February 11, 2021, state agency psychological consultant Paul Tangeman, Ph.D., reviewed Mr. Newton's medical records and found him not disabled. (Tr. 74-89). Specifically, Dr. Tangeman determined Mr. Newton's mental impairments cause moderate functional limitations in his abilities to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage himself. (Tr. 77, 85). Dr. Tangeman opined Mr. Newton remained capable of handling simple, routine one- to three-step tasks in a static environment where changes are infrequent and easily explained in advance. (Tr. 79-80, 87-88). Dr. Tangeman evaluated the 2006 and 2010 consultative examinations and determined the opinions did not assess Mr. Newton's current level of functioning. (Tr. 78, 86). On May 13, 2021, state agency psychological consultant Courtney Zeune, Psy.D., affirmed Dr. Tangeman's initial assessment. (Tr. 96, 105).

## IV.  OTHER RELEVANT EVIDENCE

Mr. Newton completed an Adult Function Report, dated February 2, 2021, to describe how his impairments limit his activities. (Tr. 256-63). Mr. Newton first noted he struggles with reading, math, and spelling; experiences depression, anxiety, and anger issues; feels nervous in new

environments; is slow at learning new things; and cannot keep up with others' pace of work. (Tr. 256).

Mr. Newton lives with his sister and her family. (*Id*.). On a typical day, Mr. Newton wakes up, feeds his turtles, takes his medication, gets cleaned up, smokes a cigarette, watches movies or plays video games, helps his sister or her husband around the house a little, eats dinner, helps clean up, and goes to bed a few hours later. (Tr. 257). Due to constant racing thoughts, Mr. Newton has difficulty with sleep. (*Id*.). He can prepare easy meals, like cereal or frozen food, and his sister typically prepares dinner. (Tr. 258). Mr. Newton can drive and shop on his own but needs help to pay bills, count change, handle a savings account, and use a checkbook or money orders. (Tr. 259). His sister assists him with all his paperwork. (Tr. 263).

Mr. Newton endorsed problems getting along with others because he can be "very edgy" and "sometimes explode[s]." (Tr. 260). His mental impairments affect his memory, concentration, and abilities to understand, follow instructions, and interact with others. (Tr. 261). He can pay attention for a long time if there are no distractions. (*Id*.). He has difficulty reading written instructions but can follow spoken instructions if they are well-explained. (*Id*.). Mr. Newton has never been fired or laid off from a position because of problems getting along with others but has left all of his former jobs because he would get "very upset." (*Id*.). He does not handle stress or changes in routine well and has a fear of large crowds. (Tr. 262).

On August 29, 2021, Mr. Newton's friend completed a Third-Party Function Report to describe how Mr. Newton's impairments affect his activities. (Tr. 304-311). At one point, Mr. Newton lived with this friend. (*See* Tr. 37, 311) (residing at the same address). The friend identified severe obesity and depression as impairments affecting Mr. Newton's ability to work.

10

(Tr. 305). He noted Mr. Newton sleeps in two-hour intervals, bathes less than once a month, cares for his hair once a month, and shaves twice a week. (*Id*.). He needs reminders to care for his personal hygiene. (Tr. 306).

He observed Mr. Newton is able to cook but needs encouragement and assistance to clean up after himself. (*Id*.). Mr. Newton has no motivation to do house or yard work and rarely goes outside. (Tr. 307). His mother handles all his money and pays his bills. (Tr. 307-08). Mr. Newton can barely read and must have instructions repeated slowly to him a few times. (Tr. 309). His friend acknowledged Mr. Newton's temper and stated he is "terrible" at handling stress and changes in routine. (Tr. 310).

## V.   ADMINISTRATIVE HEARING

At the administrative hearing, Mr. Newton's attorney represented his mental health impairments meet Listing 12.03 (Schizophrenia spectrum and other psychotic disorders) on account of his disorganized thinking and limitations in interacting with others and adapting or managing himself. (Tr. 35). Mr. Newton's attorney also emphasized his client's chronic instability as affecting his ability to remain on task and attend work regularly. (Tr. 36). Last, Mr. Newton's attorney claimed his work history, reflecting 21 different jobs between 2006 and 2020, suggests an inability to sustain and maintain employment. (*Id*.).

Mr. Newton testified he is a high school graduate but struggles to understand what he is reading. (Tr. 38). He can read simple words (*e.g.*, roadwork, men's room, women's room) but requires help reading documents like letters that come from the child support agency. (*Id*.). He struggled to graduate and was in special education classes. (Tr. 49-50).

11

When asked how his mental health interferes with his ability to work, Mr. Newton expressed getting frustrated with how others treat him when he cannot keep up; in such instances, he gets upset and, instead of "going at them," he walks out. (Tr. 48-49). He endorsed difficulty learning new things. (Tr. 49) ("it takes me a little bit to even catch on when I first start a new job, try to remember this, try to remember that, but to keep up with the person beside me, I struggle to keep up"). Mr. Newton also reported a tendency to lose his temper and engage in verbal confrontations with others. (Tr. 50). He gets along with others unless they are "the type of person that wants to start problems or get into people's faces or be rude or disrespectful and pretty much being a punk of some sort," in which case he tries to avoid such people so that he does not hurt anyone. (*Id.*) ("I don't want to get upset. I don't want to blank out and do something I regret the rest of my life."). In past jobs, Mr. Newton described being "laughed at or bullied to the extreme," and being so irritated and upset that he would leave by breaktime. (Tr. 56). He believes extra breaks outside of the customary break schedule would give him time to calm down, get away from others, and "get [himself] back together." (Tr. 56-57).

Mr. Newton has tried to live on his own three different times but lost his housing because he is "not good with math skills and understanding when to pay a bill and when not to or when to spendy money or not to." (Tr. 58). He currently lives with his sister and her family who argue with each other a lot. (Tr. 57). When they get in arguments, Mr. Newton isolates in his room or goes outside because he doesn't like conflict, people yelling at each other, or people yelling at him. (*Id.*). He is leery and distrustful of others. (*Id.*).

Mr. Newton has trouble focusing or concentrating when he gets distracted, such as when he is on the phone and someone else has the television on. (*Id.*). He endorsed having anxiety and

expressed nervousness about the hearing and feeling anxious even when going to the doctor for a check-up appointment. (Tr. 51-52). Mr. Newton described some past "breakdowns," including when he stopped taking his medication; his mother found him rocking and repeating "it's not me," prompting her to take him to the hospital to get back on medication. (Tr. 51).

Mr. Newton denied experiencing visual hallucinations but claimed his mind "never stops," making it difficult to sleep. (Tr. 52). If he has a conflict with someone, he does not sleep until the problem is resolved. (Tr. 53). On some days, he feels so depressed he just wants to go back to sleep; on other days he is "perky," but most of the time, he feels "blah." (*Id.*).

Mr. Newton can manage his daily hygiene (showering, changing clothes, brushing teeth), clean and do dishes, and go to the store so long as his anxiety is manageable. (Tr. 53-54). Sometimes his anxiety kicks in when people are being too noisy or "kids are acting goofy in the store," but it helps when he is around other familiar people, such as his mother. (Tr. 54). Most of the time, he has to leave the store and smoke a cigarette to calm down before going back into the store. (*Id.*). Big crowds make Mr. Newton "really, really" nervous and he avoids them. (Tr. 54-55). Instead, he spends time "chilling with a friend, playing video games or just hanging out at their house and watching a movie." (Tr. 55). He enjoys sitting outside and watching the birds, playing video games, and talking to family and friends. (*Id.*). Mr. Newton used to enjoy playing pool and bowling but has not done either in a long time. (*Id.*).

VE Millie Droste identified Mr. Newton's past relevant work as material handler (DOT 929.687-030; heavy exertion as generally performed, medium as actually performed; SVP 3), merchant patroller (DOT 372.667-038; light as generally and actually performed; SVP 3), security guard (DOT 372.667-034; light as generally and actually performed; SVP 2), cleaner, commercial

or institutional (DOT 381.687-014; light as generally performed, heavy as actually performed; SVP 2), porter (DOT 915.687-022; medium as generally and actually performed; SVP 2), and automobile detailer (DOT 915.687-034; medium as generally performed, heavy as actually performed; SVP 2).

The ALJ asked VE Droste to testify whether a hypothetical individual of Mr. Newton's age, education, and experience could perform his past relevant work if the individual is limited to the performance of simple, routine tasks not performed at a production-rate pace, such as in assembly line work; simple, work-related decisions; occasional interaction with supervisors and occasional, superficial interaction with co-workers and the general public; and able to tolerate few changes in a routine work setting. (Tr. 60-61). VE Droste testified the hypothetical individual could perform Mr. Newton's past relevant work as a commercial cleaner, automobile detailer, and porter. (Tr. 61). The individual would be precluded from competitive employment if he required over-the-shoulder supervision. (*Id*.).

VE Droste further testified an individual who requires two additional 15-minute breaks each day, is off-task 20% of the workday, or is absent three times per month is also precluded from competitive employment. (Tr. 62). If the hypothetical individual could not interact appropriately with a supervisor up to two-thirds of the day during a training period of less than thirty days, the individual would not be able to maintain employment. (Tr. 64).

THE ALJ'S DECISION

The ALJ's decision included the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2025.

14

2.   The claimant has not engaged in substantial gainful activity since August 30, 2020, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.   The claimant has the following severe impairments: morbid obesity, intermittent explosive disorder, adjustment disorder with mixed anxiety and depressed mood, bipolar disorder, schizoid personality disorder, and borderline intellectual functioning (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: limited to simple, routine tasks, but not at a production-rate pace; can make simple work-related decisions; limited to occasional interactions with supervisors; limited to occasional and superficial interactions with co-workers and the general public; and can tolerate few changes in a routine work setting.

6.   The claimant is capable of performing past relevant work as a cleaner – commercial/industrialist, a porter, and an automobile detailer. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.   The claimant has not been under a disability, as defined in the Social Security Act, from August 30, 2020, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 17-24).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports

the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age,

education, and past work experience to determine if the claimant could perform other work. *Id.*

Only if a claimant satisfies each element of the analysis, including inability to do other work, and

meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f)

and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Mr. Newton takes issue with the ALJ's conclusions at Steps Three and Four of the

sequential analysis. First, he claims the ALJ failed to support the paragraph B findings made in

connection with ALJ's Listings analysis and that he "satisfie[s] the criteria of Listings 12.03, 12.04,

12.06 and/or 12.08." (Pl.'s Br., ECF # 8, PageID 620). Next, Mr. Newton avers the ALJ did not

properly apply the criteria of Social Security Ruling (SSR) 16-3p when evaluating the intensity,

persistence, and limiting effects of his symptoms. (*Id.* at PageID 622). Last, Mr. Newton argues the

ALJ erred in finding he can perform past relevant work. (*Id.* at PageID 627). According to him, the

evidence shows he requires two additional 15-minute breaks during the workday, exceeding the

allowed time off task, and that he would not be able to interact with a supervisor for two-thirds of

the day such that he would not be able to make it through a training period. (*Id.* at PageID 628).

The Commissioner responds that Mr. Newton has not shown that substantial evidence

does not support the ALJ's Listings analysis or the ALJ's evaluation of his symptoms, and the RFC

was supported by substantial evidence. (Comm'r's Br., ECF #11, PageID 648, 653, 656).

**A.    The ALJ's paragraph B findings are not supported by substantial evidence.**

Mr. Newton challenges the ALJ's Step Three findings regarding his abilities to understand,

remember, or apply information; interact with others; and concentrate, persist, and maintain pace.

(Pl.'s Br., ECF # 8, PageID 620).

18

At Step Three, a claimant will be found disabled if his impairment meets or equals one of the listed impairments. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Commissioner considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). As such, a claimant who meets the requirements of a listed impairment will be deemed conclusively disabled and entitled to benefits. *Id.*

It is the claimant's burden to establish that claimed impairments meet or are medically equivalent to a listed impairment. *See, e.g., Lett v. Colvin*, No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015). Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). To meet Listings 12.03 (schizophrenia spectrum and other psychotic disorders), 12.04 (depressive, bipolar and related disorders), and 12.06 (anxiety and obsessive-compulsive disorders), a claimant must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C. 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(A)(2). To meet Listing 12.08 (personality and impulse-control disorders), a claimant must satisfy the requirements of both paragraphs A and B. *Id.*

Paragraph A of each listing includes the medical criteria that must be present in the claimant's medical evidence. *Id.* at 12.00(A)(2)(a). Paragraph B provides the functional criteria the ALJ assesses to evaluate how the mental disorder limits the claimant's functioning. *Id.* at 12.00(A)(2)(b). The paragraph B criteria represent the areas of mental functioning a person uses in

19

a work setting, as follows: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or manage oneself. *Id.* They are evaluated based on a five-point rating scale consisting of none, mild, moderate, marked, and extreme limitation. *Id.* at 12.00(F)(2)(a)-(e). To satisfy the paragraph B criteria, the mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning. *Id.* at 12.00(F)(2). A "moderate" limitation means a claimant's functioning is "fair" whereas a "marked" limitation means a claimant's functioning is "seriously limited." *Id.* at 12.00(F)(2)(c) and (d). Rating the limitations of mental functioning requires the ALJ to consider all relevant medical and non-medical evidence in the record, including the symptoms and signs of the disorder, reported limitations in activities, and any help and support the claimant receives that is necessary for the claimant to function. *Id.* at 12.00(F)(3)(a).

When assessing whether a claimant meets or medically equals a listing, the ALJ must make sufficiently clear the reasons for the decision so a court may conduct a meaningful review. *See Harvey v. Comm'r of Soc. Sec.*, No. 16-3266, 2017 WL 4216585, at *5 (6th Cir. March 6, 2017) ("In assessing whether a claimant meets a Listing, the ALJ must 'actually evaluate the evidence,' compare it to the requirements of the relevant Listing, and provide an 'explained conclusion, in order to facilitate meaningful judicial review.'") (quoting *Reynolds v. Comm'r of Soc. Sec*, 424 F. App'x 411, 416 (6th Cir. 2011)). The ALJ need not "spell[ ] out every consideration that went into the step three determination" and, in some cases, factual findings elsewhere in the narrative may suffice as factual findings at Step Three. *Bledsoe v. Barnhart*, 165 Fed. App'x 408, 411 (6th Cir. 2006) (holding, where "ALJ described evidence pertaining to all impairments, both severe and

20

non-severe, for five pages earlier in his opinion and made factual findings," that limited Step Three explanation was sufficient). Thus, even where the ALJ does not include a detailed analysis at Step Three, courts should affirm the decision if the ALJ "made sufficient factual findings elsewhere in his decision to support his conclusions at step three." *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014).

Here, the ALJ acknowledged that no treating or examining physician or psychologist indicated Mr. Newton has an impairment that meets or equals a listing and then evaluated the paragraph B criteria, determining as follows:

> In understanding, remembering, or applying information, the claimant has a moderate limitation. As noted, the claimant was diagnosed with borderline intellectual functioning and reported having related cognitive deficits. However, a mental status examination performed at Coleman Professional in May 2021 indicates that the claimant was alert and oriented to all spheres, his fund of knowledge was normal, and there was no cognitive or memory impairment noted.

> In interacting with others, the claimant has a moderate limitation. Upon mental status examination at Coleman Professional in May of 2021, the claimant's mood was mildly depressed, but it was much better than the previous session, his speech and language were normal, and there was no evidence of suicidal or homicidal ideation, intent, or plan.

> With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation. A mental status examination performed at Coleman Professional in May of 2021 indicates that the claimant continued to have preoccupations, but did not experience any recent mania, he was alert and oriented to all spheres, and his thought associations were normal.

(Tr. 18-19).

In his RFC assessment relevant to Mr. Newton's mental health impairments, the ALJ further found as follows:

> The claimant had some counseling and medication management sessions at Coleman Professional since the alleged onset date. In December of 2020, he told his counselor there that he did not want to take any psychiatric medications

because his stress level was low, but he would visit his counselor if he started to feel bad again. Treating notes indicate that at the claimant's previous visit, he reported that his depression level was high, he was unable to stop the voices in his head, his sleep was poor, and he experienced mood swings and anger. A mental state examination performed at the current visit revealed that the claimant had a "low" and depressed mood, but his thought processes were concrete, he was alert and oriented to all spheres, and his speech and language were normal. Based on these findings and reports, the claimant's counselor diagnosed him with unspecified bipolar and related disorder and schizoid personality disorder. Furthermore, the claimant's counselor advised him to continue with individual counseling sessions and to start taking his psychiatric medications again, noting that he decompensated again off his medications.

Treating notes from Coleman Professional taken in July of 2021 indicate that the claimant was currently experiencing symptoms of depression and anxiety such as anger, racing thoughts, family stress, and ongoing worry, but he denied any suicidal or homicidal ideation and said that his psychosis level was low. Upon mental status examination at this time, the claimant had a depressed mood, his speech and language were normal, and he denied any hallucinations or delusions, but reported having thoughts that he could not stop going over again and again. Based on these findings and reports, the claimant's counselor diagnosed him with unspecified bipolar and related disorder and schizoid personality disorder. In addition, the claimant's counselor advised him to continue taking his psychiatric medications as prescribed, including Latuda and Lexapro, and to increase his Lamictal dose.

(Tr. 21-22).

I find the ALJ's conclusions as to the paragraph B criteria are not supported by substantial evidence. This is because the evidence on which the ALJ relies in support of his findings is not relevant to the areas of mental functioning.

The ability to understand, remember, or apply information refers to the abilities to recall, learn, and use information to perform work activities. 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(E)(1). Examples include understanding and learning terms, instructions, and procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using

22

reasoning and judgment to make work-related decisions. *Id.* Here, the ALJ relied on Mr. Newton being alert, oriented, and without cognitive impairment during a May 2021 appointment. But the record evidence summarized above reveals that Mr. Newton had some issue with attention, concentration, and memory at every psychiatric appointment. The ALJ's inaccurate conclusion to the contrary and subsequent failure to acknowledge elsewhere in the decision any instance in which Mr. Newton was cognitively impaired during the relevant period leads me to conclude the ALJ's decision is not supported by substantial evidence.

The ability to interact with others refers to the abilities to relate to and work with supervisors, co-workers, and the public. *Id.* at 12.00(E)(2). Examples include cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness. *Id.* The ALJ's cursory evaluation, relying on a "better" mood, normal speech and language, and no suicidal or homicidal intention or plan, does not provide sufficient explanation to determine whether the ALJ's conclusion is supported by substantial evidence. Mental status examinations throughout Mr. Newton's treating history suggest issues with social cues (perseverations and preoccupations). Aside from noting the presence of these findings elsewhere in the decision, the ALJ makes no effort to explain how this relevant evidence factored into his conclusions.

Additionally, Mr. Newton reported dealing with conflict by disengaging from the situation and isolating himself. According to Mr. Newton, he left most previous jobs because he could not

handle conflicts with colleagues; his work history report is consistent with this. The ALJ did not refer to or explain his analysis of this evidence, leaving me unable to review the ALJ's finding in a meaningful way. *See McHugh v. Astrue*, No. 1:10-CV-734, 2011 WL 6130824, at *4 (S.D. Ohio Nov. 15, 2011) ("As a rule, the ALJ must build an accurate and logical bridge between the evidence and his conclusion.... When an ALJ fails to mention relevant evidence in [the] decision, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored."). The ALJ's failure to explain more, aside from his conclusory analysis, "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Blakley v. Comm'r of Soc. Sec.* 581 F.3d 399, 407 (6th Cir. 2009).

The ability to concentrate, persist, and maintain pace refers to the abilities to focus attention on work activities and stay on task at a sustained rate. 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(E)(3). Examples include initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day. *Id.* As above, the ALJ's failure to explain the rejection of evidence probative of Mr. Newton's ability to attend to and concentrate on tasks, persist, and maintain pace denotes a lack of substantial evidence. The medical records establish the consistent presence of attention and concentration deficits, and Mr. Newton's hearing testimony supports these findings. For instance, Mr. Newton proclaimed difficulty paying attention when he is around distractions. (Tr. 57) (testifying he will become

24

distracted if he is on the phone and someone turns the television on). Without engaging with this evidence, the court cannot determine whether it was credited or simply ignored.

For these reasons, I find that substantial evidence does not support the ALJ's analysis of the paragraph B criteria. Accordingly, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** the case for additional proceedings consistent with this recommendation.

**B.**     **The ALJ's evaluation of Mr. Newton's symptoms is not supported by substantial evidence.**

An ALJ follows a two-step process for evaluating an individual's symptoms. First, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2017 WL 5180304. Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.*

At the second stage, recognizing that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence, the ALJ considers the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case. *Id.* In addition, the ALJ uses the factors set forth in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) to evaluate the individual's statements:

1.     A claimant's daily activities;

2.     The location, duration, frequency, and intensity of pain or other symptoms;

3.      Factors that precipitate and aggravate the symptoms;

4.      The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5.      Treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;

6.      Any measures other than treatment an individual uses or used to relieve pain or other symptoms; and

7.      Any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms.

The ALJ is not required to analyze all seven factors, only those germane to the alleged symptoms. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence.").

The ALJ is not required to accept the claimant's subjective complaints and may discount subjective testimony when the ALJ finds those complaints to be inconsistent with objective medical and other evidence. *Jones*, 336 F.3d at 475-76. However, the ALJ will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled. SSR 16-3p at *5. Similarly, the ALJ may not reject an individual's statements about his symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged but must carefully consider other evidence in the record. *See* 20 C.F.R. §§ 404.1529(c)(2) and 416.929(c)(2); *see also* SSR 16-3p at *6.

The ALJ is required to explain which of an individual's symptoms are consistent or inconsistent with the evidence of record and how the ALJ's evaluation of the symptoms led to his

conclusions. SSR 16-3p at *9. The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* at *10. The ALJ must limit his evaluation "to the individual's statements about his or her symptoms and the evidence in the record that is relevant to the individual's impairments." *Id.* at *11. The ALJ need not use any "magic words," so long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints, or the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]" *Ulman*, 693 F.3d at 713-14.

Mr. Newton claims he satisfied the criteria of SSR 16-3p and the ALJ "failed to articulate any supportable rationale" for his conclusions. (ECF #9 at PageID 626). The ALJ determined Mr. Newton's allegations were less than fully consistent with the evidence and concluded that the nature and degree of alleged functional limitations are not supported by medical and non-medical sources:

> The claimant admitted seeing significant improvement from his psychotropic medications and counseling sessions despite having compliance issues such as stopping his medications, and there is no evidence of recent psychiatric hospitalization in the record. Additionally, the claimant reported mostly mild to moderate level symptoms to providers at Coleman Professional, without evidence of delusions, compulsions, cognitive disorder, current suicidal/homicidal ideation,

or other serious issues. Moreover, the claimant engages in a variety of daily activities that indicate a greater level of functioning than alleged. For example, a function report from February of 2021 indicates that he is able to handle personal care, and on a typical day, he cooks simple meals, drives, completes household chores, and grocery shops once to twice per month. Thus, there are no indications in the medical record of limitations beyond the performance of work at all exertional levels with the non-exertional restrictions listed above.

(Tr. 22).

The ALJ did not explain which of Mr. Newton's symptoms he finds inconsistent with the evidence. As summarized above, Mr. Newton makes plain he has difficulty learning new things, works at a slower pace than colleagues, gets distracted easily, cannot stop his mind from racing or ruminating on the same thing over and over, and becomes frustrated and walks off a job. He also said that additional breaks during the workday would help him step away and calm down. There is support for these statements in the longitudinal record but other than to recount some of Mr. Newton's statements, the ALJ does not analyze this evidence. For instance, Mr. Newton's school records, while temporally removed from the relevant time period at issue here, establish he was in IEP classes and that he struggled with appropriate socialization and on-task behavior, had difficulty remembering and following directions, and had "significant difficulty understanding what he reads to himself." (Tr. 320). Mr. Newton's work history report, which reflects employment at numerous jobs for short durations over an extended period of time, supports his testimony. Mental status evaluations consistently emphasized Mr. Newton's continued perseverations and preoccupations, but the ALJ does not adequately address the effect either symptom has on his ability to function. This same evidence, and findings of impaired attention/concentration and memory, demonstrate why the ALJ's assertion that there is no evidence of cognitive disorder is not supported by substantial evidence.

28

Moreover, while the ALJ may consider a claimant's daily activities to evaluate the intensity, persistence, and limiting effects of symptoms, citing "minimal activities" that "are hardly consistent with eight hours' worth of typical work activities" does not justify discrediting a claimant's statements. *Kalmbach v. Comm'r of Soc. Sec.*, 409 Fed. App'x 852, 864 (6th Cir. 2011). Mr. Newton can, in fact, make simple frozen meals, drive, sweep, take out the trash, clean up after dinner, and go grocery shopping if his anxiety is not too bad, but it is not clear at all how these minimal activities are consistent with eight hours' worth of typical work activities. Moreover, Mr. Newton alleges difficulties with attention, concentration, memory, and interacting with others; the minimal activities Mr. Newton can do at home are of little relevance to his alleged impairments.

The ALJ also rests his analysis on the "significant improvement" Mr. Newton's medication afforded him, despite his documented noncompliance with treatment. As addressed above, the medical record establishes that Mr. Newton has a history of stopping his medications, either because he cannot afford them or feels well enough that he believes he no longer needs them. Invariably, the lack of psychotropic medication caused Mr. Newton to decompensate and the subsequent reintroduction to medication caused his mood to stabilize.

In accordance with SSR 16-3p, an ALJ may find a claimant's symptoms inconsistent with the evidence if the claimant fails to follow prescribed treatment that might improve symptoms but may not do so without considering the possible reasons the claimant may not comply with treatment or seek treatment consistent with the degree of his complaints. 2017 WL 5180304, at *9. SSR 16-3p directs the ALJ to review the case record to determine whether there are explanations for the inconsistencies in the claimant's statements about symptoms and their effects, and whether the evidence of record supports any of the statements at the time he made them, and

"explain how [he] considered the claimant's reasons in the evaluation of the individual's symptoms." *Id.* at *10. The ALJ did not do so here.

The ALJ has not evaluated Mr. Newton's statements in accordance with the regulations. The error is not harmless. According to the VE, two additional 15-minute breaks during the workday would exceed the tolerated off-task time and preclude an individual who requires those extra breaks from maintaining competitive employment. (Tr. 63).

For these reasons, I find that substantial evidence does not support the ALJ's analysis of Mr. Newton's symptoms. Accordingly, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** the case for additional proceedings consistent with this recommendation.

## C.    The ALJ's findings regarding Mr. Newton's RFC must be revisited.

Last, in relation to the RFC assessment, Mr. Newton believes the evidence is consistent with additional limitations that would preclude his ability to maintain competitive employment, and therefore, the ALJ erred. (ECF #9 at PageID 628).

The RFC is to be an assessment of the claimant's remaining capacity for work, once the claimant's limitations have been considered. *Id.* at 632. An ALJ is to consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ also must determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.*

In light of the ALJ's error in evaluating the intensity, persistence, and limiting effects of Mr. Newton's symptoms, and the possibility that a proper evaluation may prompt the ALJ to reach a different conclusion regarding his remaining abilities, I recommend the District Court order the Commissioner to require the ALJ reassess Mr. Newton's RFC on remand.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying disability insurance benefits and supplemental security income and **REMAND** this matter for proceedings consistent with this recommendation.

Dated: September 25, 2023

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R. Civ. P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation.** *Berkshire v. Dahl,* **928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object."** *Howard v. Sec'y of Health and Hum. Servs.,* **932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to**

the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).